*302 CANADY, J.,
concurring in part and dissenting in part.
I disagree with the decision to reject the configuration of Districts 20 through 27 contained' in the House and Senate plans. I would approve Districts 20 through 27 of the House and Senate plans because those districts meet the requirements of Apportionment VII abd result in no new constitutional violations.' ’ Regarding the configuration of the six central and southwest Florida districts on which the House and Senate plans did not agree, I would adopt the Galvano plan. Finally, I agree with the approval of the configuration of the remaining redrawn districts contained in the House and Senate plans.
The majority’s decision suffers from two fundamental flaws. First, as Justice Pol-ston has explained in greater detail, the majority has failed to examine the intent involved in drawing CP-1 and thus has failed to carry out the mandate of the Fair Districts Amendment. Second, the majority has imposed a morphing remedy" by requiring additional changes that go beyond those mandated in Apportionment VII. The first error constitutes a clear departure from the express mandate of the Fair Districts Amendment. The second error has imposed a fundamentally unfair burden on the Legislature, a burden that no litigant could reasonably be expected to meet.
The Majority’s Failure to Examine the Intent of CP-1
Justice Polston correctly concludes that the majority seriously errs in approving a redistricting plan that has never been judicially examined to determine whether it violates the constitutional prohibition of redistricting plans “drawn with the intent to favor or disfavor a political party or incumbent.”[20] It is axiomatic that replacing one partisan redistricting plan with another partisan redistricting plan does not satisfy the requirements of the Fair Districts Amendment. Yet the majority’s analysis here — as in Apportionment VII— rejects that fundamental point.
The Majority’s Morphing Mandate
Apportionment VII held that the 2014 remedial plan for certain districts was constitutionally defective in particular ways and directed that those specific defects be corrected. Under the mandate of Apportionment VIIr it is appropriate to require that the Legislature meet the burden of showing that redrawn districts comply with the directions contained in that decision. And it is appropriate to require that the redrawing of districts be accomplished in a why that avoids new constitutional violations. But the trial court and the majority have gone far beyond imposing those reasonable requirements on the Legislature. In rejecting the configuration of Districts 20 through 27 contained in the House and Senate plans, the trial court and the majority have imposed a requirement to make additional changes that were not required by Apportionment VII without any showing that the districts drawn in the House and Senate plans resulted in new constitutional violations.
The Court thus has effectively imposed a morphing remedy, and the Legislature has confronted the confounding challenge of hitting a target that has been moved after the House and Senate have acted. Whenever a court moves the goalposts on any litigant, the specter of arbitrary judicial action is likely to arise. The resulting *303 harm is compounded when the affected litigant is a coordinate' branch of government. ■ • ■ •
Although I do not suggest that the majority intends to act arbitrarily, I cannot avoid the conclusion that the deeply flawed approach adopted here — as in Apportionment VII — does serious harm to the judicial process. The result of the daunting burden placed on the Legislature is that the challengers — whose motivations have been immune from scrutiny — have been virtually guaranteed to prevail in obtaining the approval of.a map that suits them. It is highly problematic that the non-transparent process used to produce CP-1 thus has been allowed to trump the process in the Legislature that was implemented after Apportionment VII was handed down.
Districts 26 & 27
In Apportionment VII, the Court directed that Districts 26 and 27 “must be redrawn to avoid splitting Homestead.” 172 So.3d at 410. The districts drawn in the House and Senate plans unquestionably comply with that direct and unambiguous requirement. In those plans, Homestead lies wholly within District 26. The trial court expressly declined to find that Districts 26 and 27 in the House and Senate plans were drawn with “improper partisan intent.” And there is no suggestion that the districts drawn by the House and Senate created other new. constitutional violations.
Nevertheless, the trial court and the majority reject Districts 26 and 27 in the House and Senate plans on the ground that tier-two compliance would be improved by the configuration of the districts in CP-1. The majority, like the trial court, focuses on superior compactness. But as shown in the majority’s chart comparing the statistical compactness measurements for Districts 26 and 27 in the House and Senate plans with CP-1, the improvements in compactness obtained by CP-1 can only be described as minor. See majority op. at 283. More importantly, in Apportionment VII, the Court did not hold that Districts 26 and 27 were flawed because of a lack of compactness. And the statistical compactness measurements relied on by the majority show that the compactness of Districts 26 and 27 as redrawn by the Legislature is virtually indistinguishable from the compactness of those districts in the 2014 remedial plan.
Reock Convex Hull Polsby-Popper
District.26 27 26 27 26 27
Legislature .18 .46. .46 .82 .20 .43
Remedial Plan ' .18 .46' .46 .81 .20 .43
So a level of compactness that was no problem when the Court reviewed the 2014 remedial plan has now become a basis for rejecting the configuration agreed on by the House and Senate for Districts 26 and 27. '
The majority also relies on the splitting of the city of Hialeah between Districts 26 and 27 as a basis for rejecting the configuration chosen by the House and Senate. The majority prefers CP-1, which does not split the city of Hialeah. But, as with the issue of compactness, the splitting of Hialeah was not an issue in the Court’s invalidation of districts in the 2014 remedial plan — a plan that also split Hialeah. So a particular city split that was not disapproved in the- 2014 remedial plan is now condemned and cited as a basis to reject *304 districts approved by the House and Senate that comply with the Court’s direction in Apportionment VII.
I strongly disagree with moving the goalposts in this manner. Because Districts 26 and 27 in the House and Senate plans comply with the requirements imposed by Apportionment VII and create no additional constitutional violations, I would conclude that those districts should be approved.
District 25
In Apportionment VII, the Court held that “District 25 must be redrawn to avoid splitting Hendry County.” 172 So.3d at 411. The House and Senate plans eliminated the split, keeping all of Hendry County in District 25. But, once again, compliance with the unambiguous directive contained in Apportionment VII is not enough for the majority. The House and Senate are faulted for not taking additional steps to improve the tier-two performance of districts other than District 25, although Apportionment ■ VII did not impose any general requirement to make such improvements.
Again, the trial court and the majority focus on statistical measures of compactness, but the numbers do not show that CP-1 has realized anything more than de minimus improvements in ’ compactness. See majority op. at 288-89. More to the point, as shown in the chart below, the configuration in the House and Senate plans for Districts 20 through 27 — compared with the 2014 remedial plan — has enhanced compactness in certain districts and has not diminished compactness overall.
District_20 21 22 23 24 25 26 . 27
_Reock_
Legislature .48 .37 .41 .27 .38 .48 .18 .46
Remedial Plan .48 .28 .18 .27 .38 .40 .18 .46
_Convex Hull _
Legislature .75 .64 .70 .63 .73 ,73 .46 .82
Remedial Plan ' .74 .60 .61 .57 .73 .73 .46 .81 ■
_Polsby-Popper_
Legislature .20 .24 .15 .25 ' .28 .38 .20 .43
Remedial Plan .22 .26 .13 .23 .28 .32 .20 .43
I would conclude that the House and Senate plans comply with the requirements of Apportionment VII regarding the redrawing of District 25, and have done so without creating any new constitutional violations. •
Districts 21 & 22
In Apportionment VII, the Court invalidated Districts 21 and 22 and directed that they be redrawn “with the understanding that tier-two compliance could be improved.” 172 So.3d at 413. Although the Court declined to “instruct that the Legislature must necessarily redraw the- districts in a ‘stacked,’ horizontal configuration,” the Court relied on testimony by the House’s chief map drawer that a stacked “configuration would have been more compact and would have broken fewer political boundaries.” Id. at 412. The Court also referred to a draft House map showing such a stacked configuration. Id. at 411.
The House and Senate plans adopted a stacked configuration for Districts 21 and 22. As shown in the preceding chart, that configuration did make improvements to the compactness of the two districts. In addition, city splits were reduced from a *305 total of 15 to. 11, and one county split was eliminated. Nonetheless, these districts in the House and Senate plans are rejected in large part because of what the majority identifies as a “visually bizarre appendage that stretches down 1-95 through the middle of District 21, splitting three cities in the process.” Majority op. at 289. -The appendage is a portion of minority District 20. Although the appendage now dooms Districts 21 and 22 in the House and Senate plans, the appendage was never an issue in Apportionment VII. Indeed, the appendage is a prominent feature of the map the Court referred to in Apportionment VII as an example of how a stacked configuration could impróve the tier-two performance of Districts 21 and 22. It is ironic that the Legislature is 'now faulted for failing to remove the same appendage contained in a map cited by the majority to show the potential for improvement in the 2014 remedial' plan. The majority’s mandate morphs once more.
I would conclude that the House and Senate plans comply with the mandate of Apportionment VII regarding Districts 21 and 22, and ,do so in a way that does not result in new constitutional violations.
Central and Southwest Florida Districts
I agree with the majority that none of the three plans under consideration for the six central and southwest Florida districts “has a meaningful advantage with respect to compactness,” majority op. at 295, and that all of the plans comply with the requirements of the Florida Constitution. Given the absence of legislative agreement on those districts, I would conclude that on balance the Galvano plan is marginally superior because it avoids splitting either Manatee or Sarasota Counties.
Conclusion
Accordingly, I would reverse the portion of the trial court’s order adopting the configuration of Districts 20 through 27 in CP-1 and instead adopt the configuration in the House and Senate plans. I would also reverse the portion of the trial court’s order regarding the six central and southwest Florida districts and instead adopt-the Galvano plan. I would affirm the trial court’s order- approving the remaining districts contained in the House and-Senate plans.

. In Apportionment VII, I dissented from the majority’s conclusion that the whole 2014 remedial plan was tainted by an improper partisan intent to benefit the Republican Party. 172 So.3d at 417 (Canady, J., dissenting). I adhere to the view that there was no basis for the majority’s- broad finding of improper intent.